UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

----------------------------------------------------------------x
                                  :

LE TOTE, INC.,                      :          Case No. _____

                   :

              Plaintiff,    :

                   :          COMPLAINT

      -against-          :

                   :

URBAN OUTFITTERS, INC.,     :          JURY TRIAL DEMANDED

                   :

             Defendant.   :

                   :
----------------------------------------------------------------x

Plaintiff Le Tote, Inc. ("Le Tote"), by its attorneys Cohen & Gresser LLP and Braverman Kaskey, PC, as and for its complaint against Defendant Urban Outfitters, Inc. ("Urban"), hereby alleges as follows:

## NATURE OF THE ACTION

1.      This lawsuit arises out of the acquisition and misuse by Urban of highly valuable confidential information and trade secrets (the "Proprietary Information") belonging to Le Tote for the purpose of developing a fashion rental subscription business that competes directly with Le Tote.

2.      Founded in 2012 and built from the ground up, Le Tote is a pioneer in the women's fashion rental subscription industry.  Le Tote provides its customers a curated, boxed selection of garments and accessories by mail from different fashion brands on a rental basis. Through years of trial-and-error and the expenditure of substantial resources, Le Tote developed proprietary in-house tools to manage the reverse infrastructure and warehouse logistics required to efficiently process outgoing and incoming rental garments, as well as proprietary algorithms

and processes to integrate customer feedback into subsequent fashion recommendations necessary to maintain customer satisfaction.

3.       In or about March 2018, Urban, a multinational fashion retailer with annual sales in excess of $4 billion, represented to Le Tote that it wished to pursue an acquisition of Le Tote, thereby inducing Le Tote to provide Proprietary Information to Urban under a Mutual Non-Disclosure Agreement between the parties.  Pursuant to the Mutual Non-Disclosure Agreement, Urban agreed not to use Le Tote's Proprietary Information for any purpose other than evaluating a transaction with Le Tote.  Urban also represented to Le Tote that it had concluded that it lacked the knowledge and expertise to enter the rental subscription business independently and could not do so without acquiring a company like Le Tote.

4.       In reliance on the Mutual Non-Disclosure Agreement and on Urban's repeated representations about the seriousness of its commitment to acquiring Le Tote, Le Tote proceeded to provide Urban with detailed Proprietary Information about its infrastructure, reverse logistics, and warehouse systems and algorithms, as well as market research and insights that have proved essential to the successful operation of a fashion rental subscription business.

5.       The Urban team that received and reviewed Le Tote's Proprietary Information was led by David Hayne, the son of Urban's co-founder and Chairman of the Board, Richard Hayne, and also included such senior Urban executives as the company's Chief Financial Officer.  These individuals eagerly absorbed Le Tote's Proprietary Information, received multiple extensive tours of Le Tote's facilities, and pressed Le Tote for increasingly detailed future plans and analyses as the deal approached consummation.  Urban abruptly abandoned the transaction in May 2018, citing a failure to obtain the approval of Urban's Board of Directors. With its roadmap from Le Tote in hand, Urban then proceeded to launch its own competing

fashion rental subscription business, Nuuly — led by many of the same Urban executives who had reviewed Le Tote's Proprietary Information and learned first-hand how Le Tote built and operated the unique infrastructure and algorithms that made it successful.  By June 2018, one month after Urban abandoned the transaction, at least two members of the Urban team that reviewed Le Tote's Proprietary Information were already working for Nuuly, according to their public professional networking profiles.

6.    Based on the facts and circumstances surrounding Urban's discussions with Le Tote and its subsequent launch of Nuuly, as set forth more fully below, it is obvious that Urban has misappropriated and misused Le Tote's Proprietary Information in launching and operating Nuuly.  Having learned from Le Tote how to build and operate an efficient infrastructure and how to successfully incorporate customer feedback to maximize customer satisfaction and profitability, Urban's executives did not "forget" this Proprietary Information, nor could they have disregarded Le Tote's Proprietary Information in launching Nuuly.

7.    Accordingly, Le Tote brings this action alleging violations of the Federal Defend Trade Secrets Act and the Pennsylvania Uniform Trade Secrets Act, breach of contract, unfair competition, and unjust enrichment.

**PARTIES**

8.    Plaintiff Le Tote is an online women's fashion rental subscription business founded in 2012.  Through its subscription service, Le Tote has made its apparel collection available to more than 330,000 customers across 48 states.  Le Tote is a Delaware corporation with its principal place of business in New York, New York.

9.    Upon information and belief, Defendant Urban is a Pennsylvania corporation with its principal place of business located at 5000 South Broad Street, Philadelphia, Pennsylvania.

Founded in 1970, Urban, upon information and belief, is a multinational lifestyle products and services company that operates a portfolio of global consumer brands, including Anthropologie, BHLDN, Free People, Terrain, Urban Outfitters, and now Nuuly, and markets its brands through its more than 500 retail outlets in the United States, Canada, and Europe, as well as catalogs, websites, and more than 2,000 department and specialty stores worldwide.  According to Urban's filings with the U.S. Securities and Exchange Commission ("SEC"), Urban had approximately $4 billion in sales in its fiscal year ending in January 2020, had an operating income in excess of $200 million, and had more than 24,000 employees.

10.     According to Urban's SEC filings, Urban's Chief Executive Officer is Richard Hayne, who co-founded Urban in 1970 and has served as Chairman of the Board since Urban's incorporation in 1976.  Upon information and belief, Hayne has an ownership interest in Urban of approximately 20 percent, and his family plays an influential role in Urban's management. According to Urban's SEC filings, Hayne's wife, Margaret Hayne, is also a member of Urban's Board as well as its Chief Creative Officer and the Chief Executive Officer of Urban's Free People Brand, and his nephew, Azeez Hayne, is Urban's General Counsel and Corporate Secretary.  Upon information and belief, as further explained below, Richard Hayne's son, David Hayne, is now the President of Nuuly, Urban's new fashion rental subscription business.

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b), and supplemental jurisdiction over Le Tote's state law claims pursuant to 18 U.S.C. § 1367 because they are so closely related to Le Tote's claim under the Defend Trade Secrets Act that they form part of the same case or controversy under Article III of the United States Constitution.

12.     This Court has diversity jurisdiction over this action because all parties are diverse and the amount in controversy exceeds $75,000.

13.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391 because Urban's principal place of business is located in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**FACTS**

Le Tote and the Fashion Rental Subscription Market

14.     Fashion rental subscription services, sometimes referred to as "clothing as a service" or "CaaS," rent clothing and accessories to customers via mail.

15.     Le Tote debuted its rental subscription service in 2012 as one of the pioneers of the marketplace for fashion rentals by mail.

16.     For a monthly subscription fee, Le Tote loans customers garments and accessories from different fashion brands by mail.  After wear, customers return the garments or accessories to Le Tote for laundering and re-loan to additional customers.  Customers are also given the option to purchase any fashion items that they wish to keep.

17.     Le Tote's operations depend on technological infrastructure and logistical functions different from those used by traditional fashion retailers.

18.     Unlike traditional retailers, such as Urban, that generally manage product-level inventories, Le Tote manages inventory by individual garment.  This requires, among other things, bespoke warehouse management systems to track individual garments and fashion items through product onboarding; customer recommendation and selection; and return and laundering following customer loan, *i.e.*, reverse logistics or infrastructure — while understanding and tracking the useful life of each garment or accessory through washes and wears.

19.     To maximize customer retention and inventory utilization, Le Tote relies on, among other things, proprietary algorithms and customer preference data to analyze individual and aggregate customer preferences and feedback to develop style recommendations for customers.

20.     Because the fashion subscription service is a nascent industry, suitable warehouse management systems and style recommendation tools are not commercially available for purchase and must be custom developed.  Aspiring entrants to this market face significant barriers to entry in costs and lead time to develop these systems and tools.

21.     Since Le Tote debuted in 2012, no traditional retailers, other than Urban, have successfully entered the space on their own.  Instead, most traditional clothing retailers that have attempted to enter the rental subscription market have done so by "outsourcing" operations of their rental subscription services to a third-party operator to avoid the development costs and lead time required for in-house operations.

22.     In discussions with Le Tote, Urban's executives candidly acknowledged Urban's inability to enter the rental subscription market on its own, precisely because Urban lacked the experience, systems, infrastructure, and technical knowledge involved in operating a fashion rental subscription service.

23.     At the time that Urban approached Le Tote, Le Tote had built a customer base of nearly 100,000 subscribers.  Le Tote had seen continuous revenue and subscriber growth, year over year, since its inception, with revenues in excess of $60 million in 2018.

24.     Le Tote has received accolades and awards from a variety of industry publications for its industry-leading technology and has been recognized by Time magazine for its size and fit algorithm.

Le Tote's Proprietary Information

25.    Le Tote's success as a fashion rental subscription service has come neither easily
nor cheaply.  It is the product of substantial consumer research, proprietary strategies developed
in-house through trial and error as well as significant investment in development, and
comprehensive custom-made logistics systems that allow Le Tote to profitably scale its business.

26.    Successfully launching a rental subscription business required Le Tote to develop
know-how and innovative solutions to myriad challenges, both anticipated and unanticipated —
challenges that any new entrant, such as Urban, would face.  For example:

(a)  Le Tote had to develop its own processes, techniques, and systems to collect
and use customer feedback to ensure that its customer recommendations are
tailored sufficiently to the customer's desired sizing and style preferences to
retain customers.  Le Tote invested countless hours in refining these processes
over time.

(b)  Le Tote had to learn how to scale and manage its inventory, efficiently
oversee the outgoing and return shipments of its subscription boxes, ensure
that garments were appropriately and efficiently laundered, and anticipate and
minimize quality control issues over the useful life of a garment.

(c)  With no industry reference points, Le Tote had to determine how to price its
service and estimate and control its costs to maximize profitability.

27.    Over a period of years, and after substantial expenditures, Le Tote overcame these
challenges, gradually developing unique and proprietary business and engineering methods,
techniques, processes, and procedures, including technological infrastructures, logistical

functions, and customer preference tools constituting its Proprietary Information, which no competitor has been able to replicate on its own.

28.     Le Tote recognizes the value of keeping its Proprietary Information secret and carefully guards its Proprietary Information.  Among other things, Le Tote (a) requires its employees to sign a standard Proprietary Information and Inventions Agreement that prohibits them from disclosing Le Tote's Proprietary Information; (b) does not disclose its Proprietary Information to outside consultants or vendors absent confidentiality protections; and (c) requires its investors to sign non-disclosure agreements before receiving Proprietary Information.

Urban Initiates Acquisition Discussions with Le Tote

29.     In early 2018, Le Tote was pursuing potential fundraising opportunities with various potential investors, including Urban.  At the time, Le Tote was not conducting a sale process and had not invited any expressions of interest in being acquired.

30.     Following initial contact with regard to this fundraising opportunity, on or about March 27, 2018, Le Tote's founders, Brett Northart and Rakesh Tondon, traveled to Philadelphia, Pennsylvania, and met with Urban's co-founder, Chairman of the Board, and CEO, Richard Hayne, his son David Hayne, who was then Urban's Chief Digital Officer, and Melanie Marein-Efron, Urban's Executive Director of Corporate Development.  During their meeting, Richard and David Hayne advised Northart and Tondon that Urban was interested in entering the rental subscription business through an acquisition of Le Tote.

31.     Based on Urban's representations about its interest in acquiring Le Tote, the seriousness with which Urban represented that it was contemplating a strategic acquisition of Le Tote, and Urban's position as a leading retailer that could consummate a transaction of the

size it claimed to be contemplating, Le Tote agreed to engage in further discussions with Urban and to disclose Proprietary Information that would enable Urban to evaluate Le Tote's business.

The Mutual Non-Disclosure Agreement

32.     Prior to sharing any of its Proprietary Information, Le Tote required that Urban sign a non-disclosure agreement preventing the disclosure or misuse of the Proprietary Information.  Shortly after Le Tote, through its investment banker, made contact with Urban, Urban prepared, and the parties entered into, a Mutual Non-Disclosure Agreement (the "NDA") dated February 12, 2018.  A true and correct copy of the NDA is attached as Exhibit A hereto.

33.     Paragraph 3 of the NDA provided that neither party would "use in any manner or allow any of its Representatives to use in any manner any Confidential Information for any reason other than the Evaluation."

34.     "Confidential Information" was defined in the NDA as "all confidential or proprietary information (written or otherwise), in any form or medium, that is furnished or disclosed [between the parties] in connection with the Evaluation," expressly including "all information regarding the Disclosing Party's business, assets, financial condition, operations, services, equipment, software, facilities, employees, marketing methods, prices, customers, contracts, policies, suppliers and vendors, prospects and future plans."

35.     "Evaluation" was defined in the NDA as in connection with Urban's "evaluation of the business and prospects of [Le Tote] and with negotiating and consummating a possible transaction involving Urban and [Le Tote]."

36.     Paragraph 2 of the NDA further limited Urban's authorization to disclose Le Tote's Proprietary Information within Urban, providing that without Le Tote's consent, Urban "will not disclose or distribute any Confidential Information to any person, or allow any

person to have access to any Confidential Information, other than . . . those people in [Urban's] organization or professional consultants . . . who must have access to Confidential Information as it relates to the Evaluation."  Paragraph 2 further obligated Urban to "take all reasonable steps necessary to preserve the confidentiality of all Confidential Information and safeguard against its unauthorized disclosure or use . . . ."

Le Tote Provides Proprietary Information under the NDA

37.     Shortly after Richard and David Hayne represented to Le Tote's founders that Urban was interested in acquiring Le Tote, Le Tote began providing its Proprietary Information to Urban pursuant to the NDA's protections.

38.     The Urban team that engaged in the ensuing discussions with Le Tote, and that was given access to Le Tote's Proprietary Information in detail, included some of Urban's most senior executives.  Led by David Hayne and Frank Conforti, Urban's Chief Digital Officer and Chief Financial Officer, respectively, the team also included Marein-Efron, Urban's Executive Director of Corporate Development; John Devine, Urban's Chief Information Officer; Kim Gallagher, Urban's Director of Digital Strategy and Advanced Analytics; and Joe Stratter, Urban's Director of Digital Product and Portfolio.  These senior executives and others met repeatedly with Le Tote, toured Le Tote's facilities, reviewed Le Tote's Proprietary Information, and then pressed Le Tote for increasingly detailed financial analyses.

39.     For example, on or about April 10 and 11, 2018, David Hayne, Conforti, Marein-Efron, Gallagher, and Stratter spent two days at Le Tote's California facilities learning about Le Tote's business, including a full-day tour of Le Tote's only distribution center in Stockton, California.  At Le Tote's San Francisco offices, the Urban team heard detailed presentations from Le Tote's Chief Merchandising Officer and Chief Financial Officer about Le Tote's

merchandising operations; from Le Tote's Vice President-Marketing about Le Tote's marketing and customer experience operations; and from Le Tote's Chief Technology Officer about Le Tote's approach to personalization, recommendations, pricing, and warehouse/inventory management. In addition, at Hayne's request, Le Tote provided the Urban team with a walkthrough of Le Tote's financial model and an explanation of how Le Tote measures and forecasts its business.

40.     During this visit, Hayne told Northart and Tondon that Urban was not considering launching its own rental subscription business, had concluded that it lacked the capability, infrastructure, and technological know-how to do so, and had determined that it could enter this market only by acquiring a company such as Le Tote.

41.     Following the visit, on April 13, 2018, Conforti (Urban's CFO) emailed Tondon that he and David Hayne had spoken about the trip with Richard Hayne, who "shares our excitement and absolutely wants us to move forward as we discussed." Conforti also represented to Tondon that "we are very serious about this and committed to getting this done. . . . . We are committed to making sure we get to the right structure and model to make this successful for many many years to come, we do NOT see this just an investment this is a partnership and new business line for us . . . ."

42.     That same day, David Hayne requested a follow-up meeting "to go a little deeper on [Le Tote's] architecture and scalability." Thus, on or about April 16, 2018, the parties held a videoconference attended by several Urban executives, including David Hayne; Stratter; Devine; Calvin Hollinger, Chief Operating Officer; Rob Frieman, Executive Director of Engineering; Chris Hunter, Director of Engineering; Steve Festa, Director of Engineering; and Alan Rosenwinkel, Senior Data Scientist. During the videoconference, Le Tote walked Urban through

issues regarding its warehouse management system and logistics, web and iOS applications, web

merchandising system, and algorithms, answering questions about the underlying technologies,

the engineering capacity allocated to each solution, key features, scalability, and ongoing

concerns.  Le Tote also explained the key decisions and problems addressed by its various

algorithms and the data leveraged by each, as well as its information security protections.

43.     Two days after the videoconference, David Hayne requested another Urban visit

to Le Tote's California facilities, this time to enable Devine, Frieman, and Hunter to "delve a bit

deeper" with Urban's technology team.  Le Tote agreed and hosted these individuals, along with

Stratter, over two days on or about April 23 and 24, 2018, providing another detailed tour of the

Stockton distribution center and answering detailed technical questions about how Le Tote's

technology interacts with its physical distribution center.  Meanwhile, Stratter met with

Le Tote's Vice President for products and received a detailed walkthrough of Le Tote's product

roadmap, how customers perceive value in Le Tote's different product tiers, potential changes in

program offerings, impact of inventory availability on the user experience, and usage and

behavior patterns across different user devices.

44.     David Hayne also asked Northart and Tondon, in an April 17, 2018, email, to

have Le Tote undertake a brand-new, wide-ranging analysis of how it could scale to one million

users (a 1,000 percent increase from its then-current user base).  Hayne represented that the

purpose of this analysis was to "better understand the full range of considerations and needs as

we would grow the business together . . . ."  Le Tote was surprised by this request:  buyers

typically challenge aggressive projections, rather than encourage them, in order to drive down

potential acquisition price in negotiations.

45.     Nevertheless, Le Tote prepared this aggressive analysis, at considerable expense, based on its Proprietary Information and understanding of the marketplace.  This analysis, which involved input from all of Le Tote's teams as well its vendors, took Urban through all of the issues such a scaling would entail, including the extent to which Le Tote's existing services and software could be scaled; the ability of background and application servers to accommodate the additional site traffic and data throughput; the expansion of inventory and onboarding of new inventory to Le Tote's warehouse management system; the inclusion of new inventory on Le Tote's consumer-facing website; the potential creation of new fulfillment centers; the need for additional laundering equipment; and expansion of Le Tote's customer care services.  David Hayne responded by asking for additional detail, including information about possible cost savings in the customer care department and customer service software, which Le Tote provided.

46.     While Hayne and his team were arranging meetings and asking more and more detailed questions of Le Tote's senior leadership, Marein-Efron and her corporate development team tasked Le Tote with a list of "diligence" requests, to which Le Tote responded.  In keeping with the strict confidentiality requirements of the NDA, Le Tote made its responses available through a password-protected virtual data room, to which Urban personnel approved by Le Tote were given access.  The Proprietary Information made available through the virtual data room was in addition to the trove of Proprietary Information that Le Tote provided through email, videoconferences, telephone calls, in-person meetings, and tours of Le Tote's facilities.

47.     At all times, Le Tote ensured its ability to track and monitor Urban's access to its Proprietary Information by limiting access to the virtual data room and by ensuring that all attendees at real-time meetings were appropriately identified.

48.     The Proprietary Information that Le Tote provided to Urban, in the virtual data room and otherwise, consisted of and reflected Le Tote's proprietary business, engineering, and technical information, including methods, techniques, processes, procedures, and strategies, as well as technologies and infrastructures, and research compilations, such as:

(a) Information about the technology underlying Le Tote's logistics and infrastructure systems, including Le Tote's customer-facing website, fit engine, style recommendation tool, dynamic pricing engine, and the warehouse management software and control systems that enable Le Tote to track and manage its inventory and reverse infrastructure systems;

(b) Information about Le Tote's proprietary use of inventory and customer feedback data to maximize customer satisfaction and retention;

(c) A detailed product roadmap reflecting data that had been compiled from years of customer insights, as well as data and analyses regarding target demographics, marketing, customer engagement, brand identification, and premium opportunities;

(d) Extensive data about how customers hear about Le Tote; why customers sign up for the service; what aspects of the service customers value first; why customers prefer Le Tote over other competitors; how customers manage their accounts; customer demographics; what brands/styles customers identify with; what occasions customers use Le Tote for; and what services customers would be willing to pay a premium for;

(e) Construction plans relating to Le Tote's distribution center; and

(f) Wide-ranging analyses of how to scale a fashion rental subscription business.

49.     Throughout the parties' discussions, Le Tote provided the Urban team, at its request, with instruction on how Le Tote uses its data, analyses, and conclusions, including answering Urban's detailed questions about how Le Tote incorporates this information into its proprietary systems and processes and uses it in a manner that maximizes customer satisfaction and profitability.

50.     Le Tote's engineers, also at Urban's request, explained to Urban in substantial detail how Le Tote built and operates its logistics software and firmware to deliver its service quickly and efficiently.

51.     Urban repeatedly pressed Le Tote for, and received, Proprietary Information about its comprehensive algorithms, including thorough explanations of how Le Tote built its algorithms and technological architecture and how they operate.  Le Tote disclosed to Urban exactly what types of information it collects and uses, how much importance it places on different types of data, how certain information had been used inefficiently in the past, and how Le Tote incorporates different data components into algorithms and systems that function efficiently.

52.     In short, operating under the Urban-induced belief that it was demonstrating its value to the Urban portfolio rather than unwittingly grooming its competitor, Le Tote showed David Hayne and his team a detailed roadmap of how to create and operate the infrastructure, algorithms, systems, and processes to operate, maintain, and grow a fashion rental subscription business.  In doing so, Le Tote relied on the NDA as well as Urban's repeated representations that it was pursuing a transaction with Le Tote in good faith and was not contemplating independent entry into the rental subscription market.

Urban Abandons the Transaction

53.     On May 4, 2018, Urban abruptly informed Le Tote, through the parties' respective investment bankers, that Urban was abandoning the transaction.

54.     In a follow-up telephone conversation, David Hayne and Conforti told Northart and Tondon that Urban's Board of Directors had declined to approve the transaction.  According to Hayne and Conforti, Urban's Board had expressed concern about the scaling analysis that Le Tote had performed and the associated cost projections, even though Hayne had specifically pressed Le Tote for the very same aggressive scaling analysis.

55.     The news came as a complete surprise to Le Tote.  Prior to this conversation, no one at Urban had indicated to Le Tote that Urban had any reservations about the transaction, nor had anyone at Urban challenged any of the assumptions or projections underlying Le Tote's valuation of its business.  To the contrary, Hayne and Conforti had repeatedly assured Le Tote that Urban's senior executives were enthusiastic about the transaction and that the Hayne family's support for the transaction effectively ensured that approval by Urban's Board would be merely a formality.

Urban Launches Nuuly in Competition with Le Tote

56.     Either during its purported diligence or immediately after abandoning the transaction in May 2018, upon information and belief, Urban, with Le Tote's Proprietary Information in hand, began planning its launch of Nuuly, a new women's fashion subscription service that would compete directly with Le Tote.

57.     By June 2018, Urban had deployed Gallagher and Stratter — two of the Urban executives who had toured Le Tote's facilities and had access to Le Tote's Proprietary

Information — to work for Nuuly,  according to their profiles on the professional networking site LinkedIn.

58.     Urban publicly announced its launch of Nuuly in May 2019, under the leadership of David Hayne.

59.     Upon information and belief, several of the Urban employees who led its diligence team now lead Nuuly, including Hayne, who is now the President of Nuuly, and Gallagher, Stratter, and Rosenwinkel, who serve as Nuuly's Director of Marketing and Customer Success, Director of Product Management, and Senior Data Scientist, respectively.

60.     According to at least one published report, David Hayne has said that Nuuly developed its own proprietary operations.  Before receiving significant Proprietary Information from Le Tote, David Hayne had previously told Le Tote that Urban lacked the experience and capability to do exactly this.

61.     In that same article, Hayne reportedly described Nuuly as "an operations business. We are in the business of making sure that the exact six items that the customer wants are what she receives and that she receives them in excellent condition and she's happy with the experience.  If we fail in any of those points, it's an operations failure."  Hayne's quote perfectly encapsulates the value to Nuuly of the Proprietary Information acquired from Le Tote's executives and engineers pursuant to the NDA about how to use data and algorithms to maximize a customer's satisfaction with feedback about the items she receives.

62.     According to published reports, by March 2020, Nuuly had developed a customer base of 27,000 subscribers in under a year of operation.

63.     Upon information and belief, Urban misused the Proprietary Information that Le Tote disclosed to it as a roadmap to evaluate independent entry to the market and launch

Nuuly quickly, cheaply, and effectively, despite its agreement in the NDA to use Le Tote's Proprietary Information solely to evaluate a potential transaction involving Le Tote and not for any other purpose.

64.    Given the depth of the Proprietary Information, the speed of Nuuly's launch, and the fact that key senior executives of Nuuly led the Urban diligence team and had access to Le Tote's Proprietary Information, it is apparent that Urban used Le Tote's Proprietary Information to launch Nuuly, in violation of the NDA.  It is not plausible that Nuuly's senior executives, having learned in detail how Le Tote created and refined its business over six years, and having admitted that they lacked the expertise to build such a business themselves, could have then done so — and so quickly — without using the Proprietary Information that they learned from Le Tote.

65.    Urban has not compensated Le Tote for the use of Le Tote's Proprietary Information to evaluate the feasibility of a competing business or to develop a competing business.

66.    Pursuant to the terms of the NDA, and within the two-year term of the NDA, Le Tote demanded that Urban return, destroy, and cease all use of Le Tote's Proprietary Information.

67.    Upon information and belief, Urban has profited, benefitted, and been unjustly enriched by avoiding significant costs and development time to launch Nuuly in the time-frame that it did.  Whereas it took Le Tote more than four years to reach 27,000 subscribers, Nuuly was able to do so in under a year.  One executive in the fashion rental space has estimated that building a model such as Nuuly's from scratch would require $100 million.

## FIRST CAUSE OF ACTION
### (Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*)

68.     Le Tote hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

69.     The Proprietary Information disclosed by Le Tote to Urban relates to Le Tote's fashion rental subscription service.  That service, through which Le Tote provides rental clothing and accessories to customers across the United States, constitutes interstate commerce.

70.     The Proprietary Information consisted of and reflected business, engineering and technical information, including plans, formulas, compilations, techniques, processes, procedures, and programs that constituted trade secrets as defined in the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*  These trade secrets involved Le Tote's proprietary strategies, approaches, technologies and infrastructures, and consumer research, including:

- information about the technology and algorithms underlying Le Tote's logistics and infrastructure systems that Le Tote custom built, including Le Tote's customer-facing website, fit engine, style recommendation tool, dynamic pricing engine, and the warehouse management software and control systems that enable Le Tote to track and manage its inventory and reverse infrastructure systems;

- information about Le Tote's proprietary use of inventory and customer feedback data to maximize customer satisfaction and retention;

- a detailed product roadmap reflecting data that had been compiled from years of customer insights, as well as data and analyses regarding target demographics, marketing, customer engagement, brand identification, and premium opportunities;

- extensive data about how customers hear about Le Tote; why customers sign up for the service; what aspects of the service customers value first; why customers prefer Le Tote over other competitors; how customers manage their accounts; customer demographics; what brands/styles customers identify with; what occasions and periods customers use Le Tote for; and what services customers would be willing to pay a premium for;

- construction plans relating to Le Tote's distribution center; and

- wide-ranging analyses of how to scale a fashion rental subscription business.

71.     At all relevant times, Le Tote has taken reasonable measures to keep its Proprietary Information secret, including, among other things, requiring its employees, investors, outside consultants, and vendors to sign non-disclosure agreements and by requiring Urban to enter into the NDA before receiving Proprietary Information.

72.     Le Tote's Proprietary Information, in whole or in part, derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  If Le Tote did not protect its Proprietary Information, potential competitors with access to the Proprietary Information could enter the rental subscription market more easily, and existing competitors with access to the Proprietary Information could compete more efficiently and profitably.

73.     Urban misappropriated Le Tote's Proprietary Information, upon information and belief, by using the Proprietary Information without Le Tote's consent for the purposes of evaluating its launch of a competing business and, ultimately, launching Nuuly.  Upon information and belief, at the time Urban used the Proprietary Information for this purpose, Urban knew that it had an obligation under the NDA to limit its use of the Proprietary Information to evaluating a potential transaction with Le Tote.

74.     Urban's misappropriation of Le Tote's Proprietary Information has required Le Tote to retain counsel to bring this action, and to pay its counsel a reasonable fee.

75.     The facts and circumstances of Urban's conduct make clear that Urban's misuse of Le Tote's Proprietary Information was willful and malicious, such that exemplary damages

and an award of attorney's fees are appropriate under the Defend Trade Secrets Act, 18 U.S.C.

§ 1836 *et seq.*

<strong><u>SECOND CAUSE OF ACTION</u></strong><br>
<strong>(Violation of Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. § 5301 *et seq.*)</strong>

76.     Le Tote hereby repeats, reiterates and re-alleges each and every allegation as

contained in each of the preceding paragraphs as if fully set forth herein.

77.     The Proprietary Information disclosed by Le Tote to Urban consisted of and

reflected business, engineering and technical information, including plans, formulas,

compilations, techniques, processes, procedures, and programs that constituted trade secrets as

defined in the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. § 5301 *et seq.*  These trade

secrets Le Tote disclosed to Urban involved Le Tote's proprietary strategies, approaches,

technologies and infrastructures, and consumer research, including:

- information about the technology and algorithms underlying Le Tote's logistics and infrastructure systems that Le Tote custom built, including Le Tote's customer-facing website, fit engine, style recommendation tool, dynamic pricing engine, and the warehouse management software and control systems that enable Le Tote to track and manage its inventory and reverse infrastructure systems;

- information about Le Tote's proprietary use of inventory and customer feedback data to maximize customer satisfaction and retention;

- a detailed product roadmap reflecting data that had been compiled from years of customer insights, as well as data and analyses regarding target demographics, marketing, customer engagement, brand identification, and premium opportunities;

- extensive data about how customers hear about Le Tote; why customers sign up for the service; what aspects of the service customers value first; why customers prefer Le Tote over other competitors; how customers manage their accounts; customer demographics; what brands/styles customers identify with; what occasions and periods customers use Le Tote for; and what services customers would be willing to pay a premium for;

- construction plans relating to Le Tote's distribution center; and

21

   •   wide-ranging analyses of how to scale a fashion subscription business.

  78.   At all relevant times, Le Tote has taken reasonable measures to keep its Proprietary Information secret, including, among other things, requiring its employees, investors, outside consultants, and vendors to sign non-disclosure agreements and by requiring Urban to enter into the NDA before receiving Proprietary Information.

  79.   Le Tote's Proprietary Information, in whole or in part, derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. If Le Tote did not protect its Proprietary Information, potential competitors with access to the Proprietary Information could enter the rental subscription market more easily, and existing competitors with access to the Proprietary Information could compete more efficiently and profitably.

  80.   Urban misappropriated Le Tote's Proprietary Information, upon information and belief, by using the Proprietary Information without Le Tote's consent for the purposes of evaluating its launch of a competing business and, ultimately, launching Nuuly. Upon information and belief, at the time Urban used the Proprietary Information for this purpose, Urban knew that it had an obligation under the NDA to limit its use of the Proprietary Information to the evaluation of a potential transaction with Le Tote.

  81.   Urban's misappropriation of Le Tote's Proprietary Information has required Le Tote to retain counsel to bring this action, and to pay its counsel a reasonable fee.

  82.   The facts and circumstances of Urban's conduct make clear that Urban's misuse of Le Tote's Proprietary Information was willful and malicious, such that exemplary damages

and an award of attorney's fees are appropriate as set forth in the Pennsylvania Uniform Trade

Secrets Act, 12 Pa. C.S. § 5301 *et seq.*

### THIRD CAUSE OF ACTION
**(Breach of Contract)**

83.    Le Tote hereby repeats, reiterates and re-alleges each and every allegation as

contained in each of the preceding paragraphs as if fully set forth herein.

84.    The NDA constitutes a valid contract between Le Tote and Urban.

85.    The following provision in Section 3 of the NDA constitutes a material and

essential term: "Without [Le Tote's] prior written consent, [Urban] will not use in any manner or

allow any of its Representatives to use in any manner any Confidential Information for any

reason other than the Evaluation."

86.    Upon information and belief, Urban breached Section 3 of the NDA by using

Le Tote's Proprietary Information for the purpose of evaluating, developing, establishing, and

launching Nuuly in competition with Le Tote.

87.    Evaluating, developing, establishing, and launching Nuuly in competition with

Le Tote is a "reason other than the Evaluation" under the NDA.

88.    Urban's breach of Section 3 constituted a material breach of the NDA, as it went

to the NDA's core purpose of limiting Urban's use of the Proprietary Information to its

evaluation of a potential transaction with Le Tote and preventing Urban from using the

Proprietary Information to cause competitive harm to Le Tote.

89.    Le Tote has incurred damages as a result of Urban's breach of the NDA.

## FOURTH CAUSE OF ACTION
### (Unfair Competition)

90.     Le Tote hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

91.     Urban engaged in an unfair business practice when, upon information and belief, it misused Le Tote's Proprietary Information for the purpose of developing and establishing Nuuly.

92.     Urban engaged in an unlawful business practice when, upon information and belief, it misused Le Tote's Proprietary Information in violation of the Defend Trade Secrets Act, the Pennsylvania Uniform Trade Secrets Act, and the NDA.

93.     Having evaluated market entry and launched Nuuly using Le Tote's Proprietary Information, Urban now holds Nuuly out as a product or service that Urban developed on its own, without credit or compensation to Le Tote.

94.     As a result, Urban should be ordered to pay restitution to Le Tote.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

95.     Le Tote hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

96.     Le Tote conferred a benefit on Urban when it disclosed its Proprietary Information to Urban.

97.     Urban appreciated the benefit when, upon information and belief, it used Le Tote's Proprietary Information without authorization to evaluate market entry and build and launch Nuuly, a competing business.

98.     Urban unjustly retained that benefit after it ended the parties' acquisition discussions, even though it had represented and agreed that it would not use the Proprietary Information for any purpose other than evaluating a possible transaction with Le Tote.

99.     Urban is retaining that benefit at Le Tote's expense, as its use of the Proprietary Information has permitted it to compete with Le Tote to the detriment of Le Tote.

100.     Urban has therefore been unjustly enriched at Le Tote's expense, and it would be inequitable and against good conscience to permit Urban to retain the benefit of Le Tote's Proprietary Information without compensation to Le Tote.

## PRAYER FOR RELIEF

WHEREFORE, Le Tote demands judgment against Urban as follows:

A.     Injunctive relief against Urban's use of the Proprietary Information;

B.     Compensatory, punitive, and statutory damages, including but not limited to restitution and/or disgorgement, in an amount to be determined at trial;

C.     Attorney's fees to the extent permitted by contract and/or statute;

D.     Pre-judgment and post-judgment interest; and

E.     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Le Tote hereby demands a trial by jury on all issues of fact and damages as stated herein.

Dated:   June 22, 2020

**BRAVERMAN KASKEY, PC**

By: /s/ David L. Braverman
    David L. Braverman
    braver@braverlaw.com
    One Liberty Place, 56th Floor
    1650 Market Street
    Philadelphia, PA 19103
    (215) 575-3800

**COHEN & GRESSER LLP**

    Mark S. Cohen (*pro hac vice* forthcoming)
    mcohen@cohengresser.com
    David F. Lisner (*pro hac vice* forthcoming)
    dlisner@cohengresser.com
    800 Third Avenue
    New York, NY 10022
    (212) 957-7600

    Ronald F. Wick (*pro hac vice* forthcoming)
    rwick@cohengresser.com
    2001 Pennsylvania Avenue NW
    Suite 300
    Washington, DC 20006
    (202) 851-2070

    *Attorneys for Plaintiff Le Tote, Inc.*