# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LE TOTE INC., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 20-3009 |
| | : | |
| URBAN OUTFITTERS, INC., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

**TUCKER, J.**                                                             June 24, 2021

Before the Court are Defendant Urban Outfitters, Inc.'s Motion to Dismiss (ECF 15) and Plaintiff Le Tote, Inc.'s Response in Opposition (ECF 16). Upon careful consideration of the Parties' submissions and for the reasons outlined below, Defendant's motion is denied.

**I.      FACTUAL AND PROCEDURAL BACKGROUND[1]**

Le Tote filed this lawsuit on June 22, 2020, alleging that Urban Outfitters used information it gleaned during discussions of an investment—which developed into talks of a full merger—to instead make a competing product. The Motion to Dismiss and Response currently before this Court were both submitted in August 2020.

Le Tote is a fashion rental by mail subscription service founded in 2012. The company allows customers to choose pieces from a variety of brands to rent, and also provides options for customers to fully purchase products after renting. Le Tote's business relies on custom-built warehouse management systems and style recommendation tools and uses different infrastructure from more conventional fashion retailers. Le Tote identifies custom systems that

---

[1] This section draws primarily from the Complaint (ECF 1) and the facts section of Le Tote's response to the Motion to Dismiss (ECF 16). When appropriate, Urban Outfitters' characterizations (ECF 15) are also noted and will be cited specifically.

(1) ensure recommendations fit customer size and style preferences, (2) effectively manage the flow of incoming and outgoing shipments of subscription boxes, and (3) properly estimate the cost of deliveries, among other tasks. Information about these systems was protected by requiring employees, consultants, vendors, and investors to sign non-disclosure agreements (NDAs).

In early 2018, Le Tote and Urban Outfitters opened discussions into a potential investment, which was accompanied by an NDA entered into on February 12, 2018. This agreement stated that (1) Urban Outfitters could only use Le Tote's confidential information to evaluate the company for a possible investment; (2) Urban Outfitters would preserve the confidentiality of the information, and; (3) Urban Outfitters would only disclose confidential information to the individuals in its company necessary to perform the Le Tote evaluation. The NDA did not bind either side to an ultimate deal or have an exclusivity provision barring the consideration of alternative deals. Def.'s Mot. Dismiss 4. The NDA also had a sunset provision where its confidentiality obligations would expire after two years. *Id*. Additionally, the NDA itself explicitly stated that the document did not prohibit either company from subsequently offering a competing product. *Id*. at 5.

In March 2018, Urban Outfitters' CEO, Richard Hayne, raised the idea of an outright acquisition of Le Tote, leading to intensified talks between the two companies. Le Tote began sharing more information with Urban Outfitters—including two site visits, a videoconference, a walkthrough of Le Tote's product roadmap, and a prepared analysis of the company's potential to expand. Senior Urban Outfitters executives, including the company's Chief Digital Officer and CFO, frequently met with Le Tote. During one of the site visits, David Hayne, the CEO's son, told the co-founders of Le Tote that Urban Outfitters had determined it could not launch

their own rental subscription business because of the logistical lift, and could only enter the market through an acquisition, such as of Le Tote.

The information Le Tote alleges Urban Outfitters gained through these negotiations included (1) information about Le Tote's "logistics and infrastructure systems"; (2) how Le Tote used inventory and customer feedback to maximize customer satisfaction; (3) Le Tote's detailed product roadmap, and; (4) extensive consumer feedback and satisfaction data.

Urban Outfitters' proposed acquisition was abandoned in May 2018. A month later, its executives involved in the evaluation of Le Tote started planning the company's launch of Nuuly, a competitive fashion subscription service. The service, which was announced May 2019, included a number of executives who evaluated Le Tote in key roles, including David Hayne as president. In the time between the launch and the writing of Le Tote's complaint, Nuuly gained 27,000 subscribers, a number Le Tote took four years to reach.

Urban Outfitters contends that Le Tote, in waiting two years to sue over the evaporated acquisition deal, is looking for a scapegoat to distract from its broader economic troubles, driven by an ill-fated acquisition of Lord & Taylor, and exemplified by a bankruptcy filing made weeks after the filing of the complaint in this action. Def.'s Mot. Dismiss 6-7.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court may dismiss a complaint when factual allegations are not sufficient to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). A court must accept well-pleaded facts as true but disregard legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009). A court must also

determine whether facts alleged are sufficient to show that the plaintiff has a "plausible claim for relief." *Id* at 211. Determining whether a complaint has raised a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679.

III. **ANALYSIS**

　A. **Le Tote Properly States a Claim for Misappropriation of Trade Secrets Under the DTSA and PUTSA**

Plaintiff has appropriately pled a claim for misappropriation of trade secrets under both the federal Defend Trade Secrets Act (DTSA) 18 U.S.C. § 1836, *et seq*., and its Pennsylvania state law analogue, the Pennsylvania Uniform Trade Secrets Act (PUTSA) 12 Pa. C.S. § 5301, e*t seq*. Defendant's Motion to Dismiss contends that Le Tote did not (1) specify which information Urban Outfitters received that constitutes a trade secret; (2) did not establish measures to protect the disclosed trade secret information; (3) the independent value derived from the information's continued secrecy, and; (4) how the information was misappropriated and used by the clothing retailer. Each of these contentions are simply wrong or mischaracterize the standard needed to properly plead a trade secret claim at this stage.

　　1. **Le Tote Identified a Trade Secret**

The DTSA defines "trade secrets" broadly to include "all forms and types of financial, business, scientific, technical, economic, or engineering information," such as "patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" that (A) the owner has taken "reasonable measures" to keep secret, and which (B)

derives independent economic value from being not generally known. 18 U.S.C. § 1839(3). The "trade secrets" identified by Le Tote in its complaint, which range from (1) "Le Tote's customer-facing website, fit engine, style recommendation tool, dynamic pricing engine, and the warehouse management software and control systems that enable Le Tote to track and manage its inventory and reverse infrastructure systems," to (2) information about the company's use of inventory and customer feedback, and (3) "a detailed product roadmap reflecting data that had been compiled from years of customer insights," among other internal consumer data, would all easily fit within the DTSA's statutory definition. Compl. ¶ 70. A "robust consensus" of district courts across the nation, including in the Third Circuit have ruled that the allegation of misappropriation under the DTSA at the Rule 12 stage "need not describe trade secrets with particularity" to survive a motion to dismiss. *See Magnesita Refractories Co. v. Tianjin New Century Refractories Co.*, No. 1:17-CV-1587, 2019 WL 1003623, at *9 (M.D. Pa. Feb. 28, 2019) (collecting such cases nationally).

The PUTSA requires a similar showing to the DTSA: (1) the existence of a trade secret, and (2) "misappropriation of that secret"—knowingly taking improper acquisition and using or disclosing that content. *See Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 278 (3d Cir. 2019) (describing the provisions of an identical New Jersey statute); *Garcia v. Vertical Screen, Inc.,* No. 19-cv-3184, 2020 WL 2615624 (E.D. Pa. May 22, 2020) (applying the PUTSA to similar effect). District courts across the Third Circuit have made similar holdings about the level of detail needed to survive a Rule 12 motion when assessing claims made under the PUTSA. *See Magnesita Refractories*, 2019 WL 1003623, at *9 (collecting cases making this holding across Pennsylvania federal district courts).

The present motion being a Rule 12 motion to dismiss is relevant to the level of detail needed when making claims under either statute. In *Magnesita*, plaintiffs were able to generally identify "the methods and processes that constitute plaintiffs' trade secrets" that had been taken, such as "the optimization of brick properties and functionality for a given process, application, or process conditions, as well as confidential marketing and sales information" that was the result of the plaintiff's "extensive research and development efforts." *Id.*

Meanwhile, the plaintiffs were far less detailed in identifying trade secrets in the cases that Defendant cited to argue Le Tote's pleading failure. For example, in *Elsevier Inc. v. Doctor Evidence, LLC*, the party making counterclaims of trade secret misappropriation described types of content, such as "clinical methods" and "interpretation of data", but failed to detail how the content functioned, how the content was unique in the marketplace relative to competitors, or how it was secret. No. 17-CV-5540 (KBF), 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018). Other cases Defendant relies on have the same issue. *See e.g. Universal Processing LLC v. Weile Zhuang*, No. 17 CV 10210-LTS, 2018 WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018) ("Additionally, [plaintiff] has not proffered facts concerning the value and competitive advantage that the Marketing Program financial model could provide to others, only alleging vaguely that it is 'the guideline and core of Universal's 'micro-marketing' and 'advanced marketing initiatives.'").

Furthermore, Defendant selectively highlights cases that were decided on Rule 56 summary judgment motions to argue trade secrets were not properly identified, not Rule 12 motions to dismiss. *See e.g. Givaudan Fragrances Corp. v. Krivda*, 639 F. App'x 840 (3d Cir. 2016) (reviewing a district court's grant of summary judgment, cited in Def.'s Mot. Dismiss at 9) and *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (same, cited in Def's

6

Mot. Dismiss at 11). At the Rule 12 stage, however, a complaint "does not need to disclose trade secrets to state a claim". *Garcia*, 2020 WL 2615624, at *4. Furthermore, the assorted random news reports and conference presentations cited by Defendant do not constitute actual disclosure of trade secret information—even Defendant seemed to understand this, as it followed up those references with a reassurance that this Court should not take judicial notice of the information.[2] *See* Def.'s Mot Dismiss 12 ("Urban recites these reports of public statements here not [to] prove the accuracy of their contents . . . but rather to illustrate and underscore [that] . . . . [t]he categories of information Le Tote was publicly touting match the general categories of information the Complaint now purports to label as 'trade secret.'").

2. **Le Tote Identified Reasonable Means of Maintaining the Secrecy of the Disputed Information**

Defendant contends that Plaintiff, even if it did properly plead the existence of trade secrets, did not appropriately safeguard that information, a key element of making a proper trade secret claim under both the DTSA and PUTSA. 18 U.S.C. §1839(3)(A); 12 Pa. C.S. § 5302. Plaintiff described taking the following steps in safeguarding its trade secrets in the Complaint: (1) having employees sign a "Proprietary Information and Inventions Agreement that prohibits them from disclosing Le Tote's Proprietary Information": (2) not disclosing said proprietary information to outside consultants or vendors without confidentiality agreements, and: (3) requiring investors to sign NDAs before receiving "proprietary information". Compl. ¶ 28. Additionally, Plaintiff stated that when it was specifically in negotiations for an investment and possible acquisition with Defendant, it required key executives of Urban Outfitters to (1) read

---

[2] Defendant's motion refers to a Le Tote presentation at a 2016 industry conference on its AI capabilities, a set of quotes the company's CEO gave to a journalist writing about Le Tote's expansion into China, and an account from a vendor who worked on a project for Le Tote. Def.'s Mot. Dismiss 11-12.

Plaintiff's responses to diligence requests in a password protected "virtual data room"; (2) specifically approved the Urban Outfitters executives that were allowed to enter the room, and; (3) identified all attendees of real-time meetings. *Id*. at ¶¶ 46-47.

Plaintiff contends that whether a trade secret holder's measures to safeguard proprietary information are appropriately stringent "is a question of fact for the jury." *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003) (interpreting a Uniform Trade Secrets Act provision in Illinois law identical to the PUTSA). This argument, however, is disputed. There is little caselaw on this question in relation to the DTSA due to how recently it was passed, and while there are many cases on this question in relation to the older series of state-level Uniform Trade Secrets Act provisions, there are not many in the Third Circuit. *See e.g. Gov't Emps. Ins. Co. v. Nealey*, 262 F. Supp. 3d 153, 167 (E.D. Pa. 2017) (detailing this problem and listing a number of courts that have taken contrasting approaches). The court in *Nealey* disagreed with the contention that this question cannot be decided at the Rule 12 stage against the Plaintiff. *See Id.* ("While it may be true that courts often do not resolve this issue at the pleadings stage, this does not mean it is improper to do so in certain circumstances—or that it is never done.") Even so, the circumstances of that case do not apply here. In *Nealey*, the disputed information "revolves around matters that are entirely available via public record" including an affidavit, public legal filings in another federal district court, and the terms of a protective order. *Id*. Those factors are not at issue in this case—the measures described by Plaintiff cannot be inspected by this Court without one or both party's disclosure.

However, even if the court were to judge the adequacy of the alleged secrecy measures employed by Plaintiff, they would pass muster. In *Teva Pharmaceuticals v. Sandhu*, a motion to dismiss a trade secrets claim was denied, even though the steps to protect information identified

were simply (1) requiring an employee to sign a confidentiality agreement, and (2) labeling some documents as "confidential". 291 F. Supp. 3d 659, 666-67 (E.D. Pa. 2018). These are less elaborate measures than those pled by Plaintiff.

Defendant makes a number of other arguments on the secrecy question, none more convincing. One is a contention that Plaintiff's supposed "trade secrets" are not covered by the NDA because the document instead described "proprietary information". Def.'s Mot. Dismiss 13. This argument is too clever by half. "Proprietary information" is a term inclusive of information that forms the basis of a proper claim under the DTSA and PUTSA.

Defendant then contends that the two year term of the NDA—which allowed for Urban Outfitters to make products in the future that could compete with Plaintiff's—means that even if this Court rejected the squirrelly definition of "proprietary information" it offers (which it does), the protection of the NDA does not cover the conduct alleged in this suit. *Id*. at 14. However, as Plaintiff appropriately counters, the cases cited for this proposition had other issues, completely unrelated to the term of an NDA agreement, that were outcome determinative for the court. In *Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, the court denied trade secret protection because of evidence that Plaintiff and business partners exchanged confidential in ignorance of the NDA. No. 07-cv-0635, 2008 WL 166950, at *17 (N.D. Cal. Jan. 17, 2008). In *DB Riley, Inc. v. AB Engineering Corp.*, also cited for this claim by Defendant, the court held that years of an informal policy "haphazardly" distributing the design drawings at issue to customers and parts suppliers, coloring outside the lines of the appropriately rigorous on-paper confidentiality provisions, meant that there was a "relatively weak proprietary statement" on the disputed information. 977 F. Supp. 84, 91 (D. Mass. 1997). Meanwhile, Plaintiff here alleges that after Defendant walked away from the contemplated transaction, *within the term of the NDA*, it

9

demanded Defendant "return, destroy, and cease all use of" the information covered under the agreement. Compl. ¶ 66.

For these reasons, Plaintiff made a proper showing of taking appropriate steps to protect its trade secrets.

### 3. Le Tote Identified the Independent Economic Value of the Disputed Information

Plaintiff also properly alleged facts showing its trade secrets had economic value. The Complaint cites (1) warehouse management and style recommendation systems that cannot be purchased off the shelf; (2) that other clothing retailers which attempted to compete in Plaintiff's market contracted out key functions relating to the purported trade secret information, and; (3) detailed resources needed to operate a fashion rental subscription business. Compl. ¶¶ 20, 21, 52. Additionally, Plaintiff alleged that (1) Defendant had "concluded" it could not enter Plaintiff's market without access to information such as its trade secrets and (2) standing up an identical business would cost $100 million. *Id*. at ¶¶ 40 and 67. These allegations go beyond "vague references to competitive advantage", as Defendant claims, and sufficiently alleged the market value of the information at issue.

### B. Le Tote Properly Alleged Misappropriation

Plaintiff also makes a proper misappropriation claim under the DTSA. Defendant contends that the Complaint did not allege it "disclosed" a trade secret or that it had "used" the alleged trade secret information.

However, the Complaint alleges a sequence of facts that could lead to an inference of misappropriation. Plaintiff claims (1) statements by Defendant that it could not organically start a business of the kind that Plaintiff ran; (2) a launch of the competing business by Defendant a mere month after shutting down the proposed transaction; (3) using the precise kinds of

"proprietary" systems at issue in the suit, and; (4) attaining equivalent market success to Plaintiff in a quarter of the time. *See* Pl.'s Resp. 18-19 (citing relevant allegations across the Complaint). More pointedly, Plaintiff also alleged that (5) information Defendant requested in the evaluation process was inconsistent with standard acquisition behavior, and; (6) the executives involved in launching Defendant's competing project were the very same executives that evaluated Plaintiff's business for the supposed transaction. *Id*.

Allegations of the kind that Plaintiff made are more particular than other claims of misappropriation recently deemed sufficient in this district. In *Jazz Pharmaceuticals, Inc. v. Synchrony Group, LLC*, the plaintiff was able to sufficiently plead misappropriation of trade secrets by stating that upon information and belief, the defendant—a marketing firm—had gained the business of a competitor company by sharing proprietary information from the plaintiff, even though it knew that information was not to be disclosed. 343 F. Supp. 3d 434, 445 (E.D. Pa. 2018) (describing such allegations as "mov[ing] beyond speculation"). A pleading based on "information and belief" was enough to appropriately allege misappropriation "where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control" *Id*. at 445 n.50 (quoting *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267-68 (3d Cir. 2016) (internal quotation marks omitted)). The Third Circuit has also acknowledged the existence of situations where a possible competitor's possession of trade secrets made misappropriation inevitable. *See Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 111-17 (3d Cir. 2010) (finding plaintiff likely to prove that a former employee with knowledge of trade secrets would misappropriate them if allowed to work for a direct competitor). In this case, Plaintiff's ability to plead both Defendant's access to Plaintiff's

important, nonpublic competitive information, and the subsequent creation of a near-identical competing product, suggests the same misappropriation inference has been properly alleged.

### C. Le Tote Properly Alleged a Breach of Contract Claim

Plaintiff has also made a plausible claim for breach of contract. To state a proper breach of contract claim under Pennsylvania law, Plaintiff must sufficiently allege "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 635 Pa. 427, 445 (2016). Defendant contends Plaintiff failed to allege the latter two elements.

#### 1. Breach of the Contract

In arguing that Plaintiff failed to allege a breach of contract, Defendant describes the claim as being "predicated upon Urban [Outfitters]'s launch of a competing business". Def.'s Mot. Dismiss 18. However, this ignores the core point of Plaintiff's breach of contract claim: that *its own proprietary information* was used to launch this competing business, in violation of the NDA. The claim in question directly points to Section 3 of the agreement, which states that the confidential information subject to the agreement could only be used to evaluate a potential deal between the two companies. The claim then alleges the competitive business was launched using information covered by that section. Compl. ¶¶ 85-88 ("Urban's breach of Section 3 constituted a material breach of the NDA, as it went to the NDA's core purpose of . . . preventing Urban from using the Proprietary Information to cause competitive harm to Le Tote.") Plaintiff has plausibly alleged that the NDA was breached.

#### 2. Resultant Damages

Defendant then argues that Plaintiff has not pled damages as a result of its breach, as the loss of customers or business was not alleged. This argument takes a blinkered view of what the

12

harm from a contract breach can look like. Plaintiff claims that Defendant's supposed use of trade secret information to establish its competitor allowed it to leapfrog Plaintiff in the fashion rental space in a far shorter amount of time—and for far less money. Compl. ¶ 62. Damages for breach can satisfy (1) a party's expectation interest by putting it in the position it would have been in absent breach, (2) a reliance interest by putting it in the position it would have been in absent a contract, or (3) a restitution interest by forcing the other party to return the benefit it had been conferred. *Trosky v. Civil Serv. Comm'n, City of Pittsburgh*, 539 Pa. 356, 363 (1995) (quoting Restatement (Second) of Contracts, § 344, cmt. a). Any of these remedies could apply to the harm Plaintiff alleges Defendant's competitive business caused. Additionally, breach of a confidentiality agreement to bolster a competitor constitutes "a causal connection between the breach and damages" for the purposes of a contract claim under recent precedent in this district. *Jazz Pharm.* 343 F. Supp. 3d at 443 n.38.

Plaintiff has pled all three elements of a proper breach of contract claim.

### D. Le Tote Properly Alleged Unfair Competition

Plaintiff has also properly stated an unfair competition claim distinct from its breach of contract allegation, at least for the purposes of a Rule 12 motion. Defendant argues that Plaintiff's claim here falls within the Pennsylvania "gist of the action" doctrine, which bars tort claims against contracting parties in situations where the claim is simply a refashioned contract breach claim. *Bruno v. Erie Ins. Co.*, 630 Pa. 79, 87 (2014). Plaintiff's unfair competition claim alleges that "[h]aving evaluated market entry and launched Nuuly using Le Tote's Proprietary Information, Urban [Outfitters] now holds Nuuly out as a product or service that Urban developed on its own, without credit or compensation to Le Tote." Compl. ¶ 93. This is consistent with the definition of unfair competition under Pennsylvania common law: "the

13

"passing off" of a rival's goods as one's own, creating confusion between one's own goods and the goods of one's rival." *Robson Forensic, Inc. v. Heiberg*, No. CV 16-1703, 2016 WL 3078960, at *3 (E.D. Pa. June 1, 2016) (citing *Scanvec Amiable Ltd. v. Chang*, 80 Fed. Appx. 171, 180 (3d Cir. 2003)).

Even if this Court was more amenable to Defendant's questions about the unfair competition claim under the "gist of the action" doctrine, the factual intensity of disentangling the potential overlap of tort and contract claims counsels against dismissing at this stage. *See Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc.*, No. 11-cv-4568, 2011 WL 6046923, at *8 (E.D. Pa. Dec. 6, 2011) (making this choice and collecting examples of other courts holding off on this judgment at the motion to dismiss stage).

For these reasons, Plaintiff has properly alleged an unfair competition claim not barred under the "gist of the action" doctrine.

### E. The Unjust Enrichment Claim is Dismissed

As Defendant does not dispute the enforceability of the NDA, and Plaintiff has agreed to withdraw its unjust enrichment claim, this Court will dismiss it without prejudice.

## IV. CONCLUSION

Plaintiff has properly alleged conduct constituting, if true, violations of the DTSA and PUTSA, as well as proper misappropriation of trade secrets, breach of contract, and unfair competition claims. The motion to dismiss is denied with respect to all claims except for Count V for unjust enrichment, which will be dismissed due to a lack of dispute by the parties.

An appropriate order follows.