**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Le Tote, Inc.,

        *Plaintiff*,

    v.

Urban Outfitters, Inc.,

        *Defendant*.

Civil Action No. 2:20-cv-03009-NIQA

Hon. Nitza I. Quiñones Alejandro

## URBAN OUTFITTERS, INC.'S TRIAL MEMORANDUM

Pursuant to this Court's Final Pretrial Order dated August 11, 2023, ECF No. 103, and Local Rule 16.1, Defendant Urban Outfitters, Inc. ("Urban"), by and through undersigned counsel, hereby submits this Trial Memorandum summarizing the pertinent facts and legal issues involved in the case.

## I.    <u>FACTUAL SUMMARY OF THE CASE</u>

This case arises from the short-lived, and ultimately unsuccessful, discussions between Plaintiff Le Tote, Inc. ("Le Tote") and Urban in early 2018 related to Urban's potential purchase of Le Tote's clothing rental subscription business, and Urban's subsequent launch of its clothing rental subscription business, Nuuly, close to one and one-half years after those discussions ended. Now in bankruptcy (for reasons having nothing to do with Urban), with no employees, and having sold all of its assets to a third party, including those at issue in this case, the Le Tote estate falsely claims that Urban built Nuuly using unspecified, "proprietary" Le Tote trade secrets, notwithstanding mountains of evidence demonstrating that Urban drew upon its experience and track record of success in fashion retail and ecommerce, vast internal resources, and publicly available information; leveraged access to consultants and experts in the industry; and spent more than $30 million developing the business prior to Nuuly's launch.  Le Tote relies on unfounded

speculation, innuendo, and gross mischaracterizations of documents, to twist facts and wrongly assert that because aspects of Nuuly's warehouse systems supposedly resemble Le Tote's warehouse systems, Urban must have misappropriated and used Le Tote's trade secrets. The evidence belies Le Tote's reckless accusations and does not support the elements of Le Tote's claims.

### A.    The Parties

Founded in Philadelphia, Pennsylvania, in 1970, Urban is a multibillion-dollar publicly traded company (NASDAQ trading symbol: URBN), with its headquarters at the Philadelphia Navy Yard, where it employs more than 2,000 team members. Urban—with more than fifty years of retail clothing experience—is a well-established and trusted leader in retail fashion that operates through a portfolio of brands, including Urban Outfitters, Anthropologie, BHLDN, Free People, FP Movement, and Terrain, as well as Nuuly, the clothing rental and resale business at the center of this lawsuit. Urban's business model includes brick-and-mortar stores and online platforms and is supported by extensive distribution center operations and warehouse management systems, across the United States and in the United Kingdom, including so-called "reverse logistics" infrastructure that processes its garment returns.

Le Tote was formed in the San Francisco Bay area in 2012 by Rakesh Tondon, its former CEO, and Brett Northart, its former President, as an online clothing and accessories rental business. For much of its existence, it operated out of apartments and retail office space, without any warehousing or distribution operations, and at all relevant times lacked a brick-and-mortar retail presence. By late 2017, Le Tote was running out of cash. And by mid-2018—long before Nuuly launched—Le Tote began to slash its workforce and marketing efforts. Its revenues plummeted, and its business, which had never earned a profit throughout its short-lived existence as a going concern, spiraled toward insolvency. In 2020, following an ill-advised acquisition of

Lord & Taylor (more than a year *after* the end of the business discussions with Urban in early 2018 and for reasons Le Tote acknowledges have nothing to do with Urban or Nuuly), Le Tote filed for bankruptcy, sold its assets—including the intellectual property and business model at issue in this case—and permanently ceased all business operations.

### B.      Urban Explores Potential Entry Into the Clothing Rental Business

In late 2017 and early 2018, Urban's digital strategy team began exploring new business models, including a potential entry into the clothing rental business.  To understand and assess the opportunity of an expansion into this business channel, Urban gathered and reviewed publicly available information, researched the market, tested different rental services as consumers, conducted market surveys to assess the interest in rental among brand customers, interviewed rental platform users, enlisted external consultants, and reviewed rental market data.

As part of this initial exploration, Urban considered partnering with an existing rental business, building its own rental business, or acquiring an existing rental business.  To that end, over a period of several months beginning in 2017, Urban engaged in discussions with a well-established, existing business in the clothing rental space about a potential "white label" partnership—i.e., an arrangement whereby the existing company would handle the back-end logistics, fulfillment, and website for a rental business and Urban would own the visual identity and communications with customers.  Urban vetted the idea of such a partnership, including by visiting that rental company's distribution center.[1]  Ultimately, Urban did not proceed with that

---

[1] The distribution center that Urban visited had laundry operations for returned items, stored rental garments on hangers, and tracked data at the individual-garment level through bar codes.  This was not surprising given that such characteristics are intuitive, and publicly available videos depicting these features of clothing rental distribution centers (including videos of Le Tote's distribution center) had been posted online for years.

partnership.  Urban personnel also met with Rent the Runway, another major player in the clothing

rental space, which also had extensive distribution center operations, to discuss the clothing rental

market.

Urban's early evaluation of a potential entry into the clothing rental business had gained

sufficient internal momentum that, by February 2018, Urban's then-Chief Digital Officer and then-

Chief Financial Officer discussed the opportunity with Urban's Board of Directors (the "Board").

As its exploration continued, Urban began—at a very high level and without developing project

plans—considering the time, effort, and resources it would take to build and launch a clothing

rental business that would rely on Urban's well-established fashion brands.

### C.      Le Tote Seeks a Financial or Strategic Investor to Stay Solvent

As Urban evaluated whether and how best to enter the clothing rental space, Le Tote was

struggling to continue as a going concern.  Throughout its brief existence, Le Tote never turned a

profit and, according to Le Tote's former Chief Financial Officer, was "always in fundraising

mode."

By late 2017, running out of cash and teetering on the verge of insolvency, Le Tote

desperately sought a financial or strategic investment to stay afloat.  On December 15, 2017, Le

Tote engaged Jefferies, LLC, as its financial advisor, for a fundraising initiative with a goal of

raising $30 million to $50 million.

Between January and April 2018, Le Tote had discussions with twenty to thirty potential

investors.  As part of this process, Jefferies established a data room to share Le Tote information

with potential investors.  While several would-be financial investors accessed information from

the data room, none made an offer.  Indeed, the only offer of any kind that Le Tote received was

from Urban.

By April 2018, Le Tote had reached the tail end of the fundraising process without any success and anticipated that it would run out of cash within weeks.  In May 2018, Le Tote initiated a massive reduction-in-force in an effort to stay solvent and sharply curtailed its marketing efforts. Le Tote's former Chief Executive Officer admitted that the company had no contingency plan if it ran out of cash.

### D. Le Tote Approaches Urban with an "Investment Opportunity," and They Execute an NDA

On January 16, 2018, as part of the fundraising efforts, a Jefferies representative contacted Urban's then-Chief Financial Officer, highlighting Le Tote as an interesting investment opportunity.  Approximately one month later, Le Tote and Urban executed a Mutual Non-Disclosure Agreement (the "NDA") "in connection with an evaluation of the business and prospects of [Le Tote] and with negotiating and consummating a possible transaction involving Urban and [Le Tote]."  ECF No. 1-1 at 1.  The NDA, effective February 12, 2018, governed the use and disclosure of all "Confidential Information"—broadly defined to include all proprietary information—exchanged by the parties in connection with their discussions.  *Id.*  It did not bind either party to a deal, nor did it have an exclusivity provision that precluded either party from pursuing other strategic alternatives while they were evaluating this potential opportunity.

The NDA included a sunset provision whereby the parties agreed that the NDA terms— including confidentiality obligations—would have no force or effect after two years.  In particular, pursuant to Section 13 of the NDA, each party's contractual obligations, including with respect to use and disclosure of "Confidential Information," were set to "expire and be of no further force and effect" automatically by February 12, 2020.  *Id.* § 13.

Recognizing that the parties might not reach an agreement, leaving each to continue to pursue its respective business as it deemed appropriate, the NDA addressed "Use" of Confidential

Information and expressly accounted for the possibility that Le Tote and Urban could become competitors in the future:

> USE.  Without the Disclosing Party's prior written consent, the Receiving Party will not use in any manner or allow any of its Representatives to use in any manner any Confidential Information for any reason other than the Evaluation.  Both parties hereto acknowledge that they are aware, and will advise any of their Representatives who receive Confidential Information, that applicable securities laws may prohibit any person who has material, non-public information from purchasing or selling securities of the company to which such information relates or from communicating the information to any other person or entity.  Except for the obligations of use and confidentiality imposed in this Agreement, no obligation of any kind is assumed or implied against either party by virtue of the parties' meetings or conversations with respect to the Confidential Information.  *Nothing herein* requires either party to disclose or update any information to the other party or, subject to the obligations of use and confidentiality imposed herein, *impairs either party's right to make, use, procure, or market any products or services, now or in the future, which may be competitive with those offered or contemplated by the other party.*

*Id.* § 3 (emphases added).

As such, the parties agreed that Urban could freely launch its own competing rental business or acquire a competing rental business, provided Urban otherwise complied with the NDA (to the extent it remained operable) in such endeavor.  This ability to compete went both ways, as the parties likewise agreed that Le Tote could freely launch or acquire its own competing retail business, as it ultimately did when it acquired Lord & Taylor in 2019, provided that it otherwise complied with the NDA in doing so.

### E.      Urban and Le Tote Explore a Potential Deal

Over a month after execution of the NDA, representatives from Urban and Le Tote began meeting so that their respective teams could get to know one another and exchange information for the purpose of evaluating a potential transaction.  Members of Le Tote's executive team traveled to Philadelphia for a dinner with certain Urban executives on March 27, 2018, and

meetings at Urban's headquarters on March 28, 2018.  On March 29, 2018, more than six weeks after executing the NDA, Urban first requested access to Le Tote's diligence data room.

Two weeks later, on April 10 and 11, 2018, a few members of the Urban team visited Le Tote in San Francisco.  That visit included a tour of Le Tote's distribution center in Stockton, California, as well as exploratory meetings, including sessions for introductions and ice breakers and a presentation by Urban, along with brief discussions of merchandising, marketing, and customer experience.  The distribution center operations observed during the tour generally were the same as those that Urban observed at other clothing rental distribution centers it toured.

Shortly after the April 10 and 11 visit, Urban and Le Tote scheduled a short follow-up call to discuss Le Tote's warehouse management system ("WMS") and logistics, web application, iOS App, web merchandising system, and algorithms.  In advance of that call, Le Tote provided Urban with an "Engineering, Product & Design" presentation that gave a high-level overview of Le Tote's inventory management and logistics systems, including Le Tote's use of radio frequency identification ("RFID") and barcode technology to track garments throughout its distribution center.  It also referenced Le Tote's use of various algorithms, including a fit algorithm, a style algorithm, and a dynamic pricing algorithm.  Urban never requested, and Le Tote never shared, the source code that was used by Le Tote in connection with any of its algorithms or software.  In other routine, diligence-type discussions, Le Tote gave a general overview of its product roadmap and customer insights.  In response to Le Tote's identification of scalability as a challenge to its growth—i.e., the ability of Le Tote's logistics systems to handle the type of volume that Urban anticipated would be needed if the businesses combined and Urban's customers started signing up, Urban asked for additional information about the challenge and requirements to scale to one

million users.[2]  As Le Tote admitted, all of Urban's requests for information were standard "due diligence" requests for a potential transaction of the nature being discussed.

### F.  Urban's Board of Directors Authorizes an Offer to Le Tote

Due to its fundraising pressures, Le Tote compressed the period to consider a potential transaction.  To accommodate Le Tote's timing, on May 2, 2018—less than five weeks after Urban first was given access to Le Tote's data room—the Urban Board held a special meeting to evaluate a potential transaction with Le Tote.  Ultimately, as the Board minutes reflect, the Board's consensus was that subscription clothing rental was the right strategy for Urban and worth a significant investment.  However, the Board told management that it believed Le Tote was significantly overpriced, and authorized management to pursue a transaction only within certain financial limits well below Le Tote's inflated assessment of its value.

### G.  Le Tote Rejects Urban's Offer and Makes No Counteroffer

On May 4, 2018, following the special meeting of Urban's Board, Urban made a purchase offer, which Le Tote promptly rejected without making any counteroffer.  Le Tote's records confirm the last time any Urban employee accessed the data room was the morning of May 4, prior to the offer.

Shortly after Le Tote rejected Urban's purchase offer, Urban counsel instructed employees who received Le Tote information to destroy any hard-copy documents and sequester electronic documents accessed from the data room or otherwise provided by Le Tote.  Urban did not access any of this information after it was quarantined.  While the NDA authorized Le Tote to demand the return or destruction of any confidential information it disclosed pursuant to the NDA, the first

---

[2] Le Tote witnesses testified that Urban's broader customer base was one of the reasons the company was interested in a potential transaction with Urban.

and only time Le Tote made such a request was in January 2020, when it simultaneously threatened this suit.

### H.    After Le Tote Rejects Urban's Offer, Urban Focuses on Building Its Own Subscription Rental Business

After Le Tote rejected Urban's purchase offer, Urban turned its efforts to building its own clothing rental platform.  In furtherance of this goal, without using any Le Tote confidential information, Urban leveraged its years of retail experience—including its existing financial systems, infrastructure, marketing, human resources, and customer bases—and committed the necessary resources to develop and build its own subscription rental business.  To support this effort, Urban engaged external experts and consultants to help develop and implement its new rental business.  Urban contracted with the former head of warehouse operations at Rent the Runway to help develop the logistics plan for Nuuly.  Urban consulted with a Professor at the University of Pennsylvania's Wharton School of Business regarding Urban's approach to customer marketing and data science opportunities.  Urban engaged a branding agency to help establish the name, visual identity, and brand voice for Urban's rental platform.  Urban identified warehouse space and ultimately executed a lease for a warehouse that would be built out as Nuuly's distribution center in Bristol, Pennsylvania.  And Urban engaged Hudson Equipment to size, scope, and deliver the full laundry equipment design and package for the Nuuly distribution center.

Urban also hired external talent, none of whom was involved in prior discussions with Le Tote, to lead the technical and logistics efforts to support its rental business.  By way of example, in June 2018, Urban re-hired a former Urban software engineer as a full-time, dedicated lead

software architect to develop the technological aspects of a prospective rental business.[3]  Urban also hired a former Gwynnie Bee Operations Manager, who opened that company's distribution center, as Urban's full-time, dedicated operations lead responsible for organizing the operations inside of Nuuly's distribution center, staffing the distribution center, building a management team inside the distribution center, and beginning processing inventory and orders for the Nuuly launch. These new hires worked closely with Urban's product management team to determine what technology would be used in the distribution center and to optimize and track the flow of garments within the distribution center.

In addition, Urban reassigned existing personnel and brought on new employees and contractors with expertise in buying, planning, marketing, engineering, digital product, and logistics who could contribute to the development of a rental business.  Urban worked with numerous outside consultants and experts who assisted with various aspects of its development of a rental business, including logistics and marketing experts, storage suppliers, a public relations agency, a consultant for laundry equipment design, a packaging consultant, and more than twenty technology vendors.  In particular, Urban engaged technology vendors to support its development of a rental platform, including to add engineering resources to develop and expedite the front-end of the Rental Management Solution that controlled the distribution center for Urban's rental business and portions of its website.  Other services provided by third-party technology vendors engaged by Urban included hosting infrastructure, data-reporting infrastructure, subscription

---

[3] In deposition, the software engineer, who was not an Urban employee at the time of the company's discussions with Le Tote, confirmed that he never saw any Le Tote confidential, proprietary information during his work developing Nuuly.

management, product wait-list support, customer support, customer communications, customer insights, photo management, shipping support, and text-messaging support.

In parallel, Urban continued its research of the rental market, which included conducting a study to refine Urban's go-to-market strategy for its rental platform and program offering, e.g., brand mix, number of garments, number of shipments, and price points.

All told, Urban's effort to develop and launch Nuuly entailed a massive investment of time and resources, which included a capital investment of tens of millions of dollars prior to launch.

## I.    Urban Announces the Launch of Nuuly

On May 21, 2019, more than a year after discussions with Le Tote ended, Urban announced plans—still months away—to launch Nuuly, a clothing rental subscription service featuring Urban's proprietary and well-established fashion brands.  Nuuly began accepting customers at the end of July 2019—fifteen months after it began developing the business, following the end of the Le Tote discussions—allowing customers to view the Nuuly website and sign up for the waitlist. In the months that followed, Nuuly began releasing customers from the waitlist, accepting orders, and shipping rental clothing, slowly expanding its operations from a more limited basis to Urban's broader customer base.

At launch, the technology underpinning Nuuly embodied the "minimum viable product"— i.e., an offering that contained the minimum features needed to begin doing business.  Over time, Urban refined and enhanced Nuuly's features.  Nuuly offered customers the ability to subscribe to access six clothing items from Urban's brands, as well as other market brands for a monthly fee; those items could be kept for one month and, once returned, customers could order six new items they would receive for the next month.  These and other features of Nuuly's business, including the customer interface, differ from Le Tote's model.  Unlike Le Tote, Nuuly never employed a fit

algorithm or a style selection algorithm.  The code and coding language underpinning the software used in Nuuly's rental platform differed from Le Tote's as well.

**J.      Le Tote's Financial Condition Continued to Deteriorate, Culminating in Its Filing for Bankruptcy Protection**

Following Le Tote's rejection of Urban's purchase offer, Le Tote faced mounting financial pressures that negatively affected its operations.  In an ill-fated strategic move, given its precarious financial condition and operational challenges, on August 27, 2019, Le Tote agreed to purchase Lord & Taylor, a company that had suffered a $119 million loss in fiscal year 2018, for $75 million in cash and a secured promissory note for $29.5 million.  In acquiring Lord & Taylor, Le Tote took on substantially more debt.  The Lord & Taylor transaction closed in November 2019.

By late March 2020, Le Tote was in the final stages of a self-described "liquidity crisis" facing "dwindling cash flows, inaccessible inventory, and the inability to access even incremental liquidity."  *In re Le Tote, Inc.*, Case No. 20-33332-KLP (Bankr. E.D. Va.), ECF No. 15 (Kremer Decl.) ¶ 45.  On June 22, 2020, Le Tote commenced this lawsuit by filing the Complaint against Urban.  ECF No. 1.  Just weeks later, on August 2, 2020, both Le Tote and Lord & Taylor filed for bankruptcy protection.  *See In re Le Tote, Inc.*, Case No. 20-33332-KLP (Bankr. E.D. Va.).

Le Tote witnesses admitted, and its financial records support, that Le Tote's insolvency had nothing to do with Urban.  Le Tote's sharp revenue declines began well before Nuuly commenced operations.  Moreover, as Le Tote's Chief Restructuring Officer told the Bankruptcy Court, the causes of the insolvency were "increased competition," the COVID-19 pandemic, the economy, and increased debt from the Lord & Taylor acquisition.  At deposition, Le Tote's former executives cited similar reasons for Le Tote's filing for bankruptcy protection.  Le Tote does not claim that any conduct by Urban was even a contributing factor in Le Tote's bankruptcy.

**K.    Le Tote Sells Its Assets to the Saadia Group, Including All Business Intellectual Property**

Shortly after it filed for bankruptcy protection, Le Tote and the Saadia Group entered into an Asset Purchase Agreement ("APA"), dated October 16, 2020, pursuant to which Le Tote sold its assets (including the Le Tote business) to Saadia.  On October 22, 2020, the bankruptcy court approved the sale of assets contemplated by the APA.[4]

The APA identified the Acquired Assets sold by Le Tote to Saadia as including "all Business Intellectual Property, including, but not limited to all intellectual property listed on Schedule 1.1(b)" and "all causes of Action . . . existing on the Closing Date and in each case to the extent exclusively related to the Business Intellectual Property."  The APA defined "Business Intellectual Property" as "all Intellectual Property exclusively used in the Business, including, but not limited to, the Registered Intellectual Property."

At that time, Saadia became—and since then has remained—the sole owner of all of Le Tote's intellectual property.  Le Tote's corporate designee admitted that Saadia acquired all of Le Tote's customer insights as well as its dynamic pricing engine, fit engine, inventory management system, logistics system, product roadmap, and style recommendation tool, and Le Tote, the bankrupt entity that is the plaintiff in this case, no longer owns or controls any of the Le Tote confidential information at issue.

---

[4] Upon the closing of the sale, the bankruptcy court's Sale Order would be "construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer to Purchaser of the Debtors' interests in the Acquired Assets."  *In re Le Tote, Inc.*, Case No. 20-33332-KLP (Bankr. E.D. Va.), ECF No. 473 ¶ 12.  All persons and entities in possession of some or all of the Acquired Assets at the sale's closing were thus directed to "surrender possession" of such assets to Purchaser, in accordance with the APA.  *Id.* ¶ 10.

**L.      Le Tote Has Not Identified Any Trade Secrets Supporting Its Claims**

When Le Tote commenced this trade secret misappropriation litigation in June 2020, its Complaint failed to identify the trade secrets or confidential information that Urban purportedly misappropriated and used.  ECF Nos. 1, 15.  This omission, and Urban's repeated efforts to compel Le Tote to identify the claimed trade secrets or confidential information on which Le Tote's claims are based, was a central focus of discovery in this action.  For example, on November 18, 2021, Urban served its First Set of Interrogatories, which sought (among other things) (i) the specific Le Tote trade secret/proprietary information that Le Tote placed at issue in this litigation, (ii) any factual information in Le Tote's possession supporting Le Tote's allegations that Urban misappropriated that information, and (iii) information regarding Le Tote's efforts to protect the confidentiality of its alleged trade secrets.  Essentially conceding that it could not identify any trade secrets that were misappropriated, Le Tote objected to each request on the grounds that it had requested discovery from Urban to identify which of its trade secrets Urban misappropriated while developing and launching its competing business.   Standing on its objections, Le Tote provided no substantive response.

On March 14, 2022, Urban filed its first motion to compel responses to Interrogatory Nos. 1 to 5.  *See* ECF Nos. 37, 38.  While that motion was pending, on May 13, 2022, Urban served a second set of interrogatories, again requesting that Le Tote identify and describe with specificity the Le Tote "trade secret" or "proprietary information" that Le Tote alleges forms the basis of its Complaint.  Le Tote again objected.  On August 26, 2022, this Court granted Urban's motion to compel responses to its First Set of Interrogatories and ordered Le Tote to "provide full, complete, and verified responses to Interrogatories 1 through 5 by September 15, 2022."  ECF No. 59.  Le Tote served supplemental responses to Interrogatory Nos. 1 to 5, purporting to identify the trade secrets allegedly misappropriated by Urban, verified by Le Tote's Chief Restructuring Officer (the

"Supplemental Responses"). In those Supplemental Responses, Le Tote listed the following categories of information as trade secret information purportedly misappropriated by Urban:

       (i) its inventory management system;

       (ii) its RFID-driven logistics system;

       (iii) its algorithms;

       (iv) its systems interaction;

       (v) its customer insights, roadmap, and scaling; and

       (vi) its financial information/modeling information.

But, in addition to the existence of contemporaneous public information debunking the notion that this information qualified as proprietary trade secrets,[5] Le Tote's own witnesses repeatedly undermined Le Tote's claims of trade secret protection concerning those categories, testifying they either did not view Le Tote's systems or information to be trade secret or identifying components of Le Tote's systems as common in the industry.

> **M. Le Tote Has No Evidence of Use of Any Le Tote Confidential or Trade Secret Information by Urban**

Le Tote's Supplemental Responses also contained no explanation of the manner in which Urban purportedly used Le Tote's trade secret information. Indeed, Le Tote's witnesses uniformly admit they have no knowledge of any use by Urban of Le Tote's purported confidential, proprietary, or trade secret information in connection with the development or launch of Nuuly.

---

[5] For instance, detailed and lengthy videos of Le Tote's Stockton, California distribution center (including interviews of Le Tote warehouse managers and workers) have been publicly available since 2016 and depict what Le Tote now claims to be its trade secrets—namely, the flow of garments throughout the distribution center, its organization by row, shelf, and slot, the manner in which garments are electronically tracked throughout the facility, and the order-picking process.

Although Le Tote engaged its former Chief Technology Officer to compare Nuuly's WMS to Le Tote's WMS and opine as to any similarities between them, he admitted on cross-examination he did not know what systems Nuuly had at launch and did nothing to personally investigate what systems Nuuly had at launch.

## II.   THE PARTIES' CLAIMS AND DEFENSES

### A.   Overview of Le Tote's Causes of Action

The Complaint asserts the following causes of action against Urban (i) violation of the Defend Trade Secrets Act ("DTSA") (Count I), (ii) violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA") (Count II), (iii) breach of contract (Count III), (iv) unfair competition (Count IV), and (v) unjust enrichment (Count V). *See* ECF No. 1. Each claim is premised on the theory that Urban gained access to Le Tote confidential information under the NDA and used that information to develop and launch Nuuly. *See id.* ¶¶ 63–67.[6]

### B.   Summary of Urban's Defenses

Le Tote cannot meet its burden with respect to any of its claims.

#### 1.   Counts I and II: Violation of the DTSA and PUTSA, respectively

A DTSA claim is available only to the "owners" of a trade secret, which Le Tote is not. In November 2020, Saadia—a non-party in this litigation that has not asserted any claim against Urban—purchased and became the sole owner of all of Le Tote's alleged trade secrets. Similarly, a claim for misappropriation under the PUTSA requires proof of "lawful possession,"

---

[6] On June 24, 2021, this Court dismissed Le Tote's unjust enrichment claim (Count V). *See* ECF Nos. 20, 21. On February 13, 2023, Urban moved for summary judgment with respect to each of Le Tote's remaining claims. In its response in opposition, Le Tote stated, "Le Tote hereby withdraws its existing claim for unfair competition." ECF No. 84 at 39; *see also id.* at 10 n.4. As a result, only Counts I, II, and III remain in this case.

i.e., "continued use, possession, and protection," of any claimed trade secret.  Following the sale of assets to Saadia, Le Tote is no longer in "lawful possession" of any alleged trade secret.

Separate and distinct from its lack of ownership/possession, Le Tote has failed to identify any alleged trade secret with the requisite level of specificity, such that no reasonable jury could find that it established each statutory element of a trade secret.  To the extent Le Tote has identified categories of information it claims is trade secret, such information is not entitled to trade secret protection because, among other reasons, it is publicly available and/or generally known in the industry.  For example, with respect to Le Tote's "inventory management," "RFID-driven logistics systems," and "systems interaction," Le Tote's own witnesses concede that the information needed to develop a WMS for a clothing rental business was known generally by others in the rental business and the distribution and warehouse industries—both with respect to the individual processes that take place in a WMS and the combination of those processes.  Numerous publicly available videos and articles depict these common processes within warehousing/distribution operations.  And Urban's rebuttal expert, a board-certified, licensed, registered Professional Engineer with decades of experience in warehousing, logistics, and distribution operations, opined that (a) he was familiar with all of the components of Le Tote's described warehouse management methods and processes, (b) there was nothing unique about them (in isolation or combination), and (c) numerous businesses utilize a combination of the various technologies and processes that Le Tote claims to be its trade secrets.  Moreover, Urban itself had significant prior experience operating distribution centers for its retail operations, including prior experience using RFID to track products and manage inventory, which it leveraged during its development of Nuuly.

With respect to all identified categories of alleged Le Tote trade secrets, Le Tote cannot establish that it undertook reasonable measures to keep such information secret, nor can Le Tote establish economic value associated with the secrecy of such information.

In addition, there is no evidence (direct or circumstantial) to suggest that Urban actually used any of Le Tote's alleged trade secrets. Substantial documentary and witness evidence supports Urban's independent development of Nuuly, including with respect to its WMS and distribution center. And Nuuly's business and operations are markedly different from those that Le Tote claims as trade secret.

Furthermore, Le Tote's inability to prove damages associated with any alleged misappropriation precludes recovery. Le Tote cannot plausibly claim damages associated with conduct post February 12, 2020, at which point both parties' obligations under the NDA—including confidentiality obligations—expired and had "no further force and effect." ECF No. 1-1 § 13.

### 2. Count III: Breach of Contract

Urban's decision to develop and ultimately launch Nuuly, a competing clothing rental subscription business, is not a violation of the parties' NDA. To the contrary, the NDA expressly contemplated that Urban and Le Tote may not reach an agreement and may instead become competitors. As Le Tote's witnesses uniformly admit, there is no evidence to suggest, let alone prove, that Urban actually used any confidential information it learned from Le Tote in violation of the NDA.

## III. RELIEF SOUGHT

Urban disputes that Le Tote is entitled to damages of any kind. Moreover, Le Tote's damages analysis, including as set forth in the report of proffered expert Ian Ratner, should be inadmissible for the reasons set forth in Urban's pending *Daubert* Motion to Exclude the Report,

Opinions, and Testimony of Ian Ratner.  ECF No. 118.  Mr. Ratner's opinion also is flawed in multiple respects, including those set forth in the rebuttal expert report of Carlyn Irwin, Senior Advisor at Cornerstone Research.

## IV.    SPECIAL ISSUES

### A.    Le Tote's Statutory Trade Secret Misappropriation Claims Are Foreclosed by the Parties' NDA.

Le Tote's only viable cause of action for the alleged misuse of confidential information shared pursuant to the parties' mutual NDA is a breach-of-contract claim under the agreement. The NDA prohibits either party from "us[ing] in any manner or allow[ing] any of its Representatives to use in any manner any Confidential Information for any reason other than the Evaluation," except with the disclosing party's prior written consent.  ECF No. 1-1 § 3. "Confidential Information" is defined as including "all confidential or proprietary information . . . in any form or medium" disclosed by one of the parties pursuant to the agreement, including any alleged trade secret.  *Id.* § 1.  Trade secrets plainly fall within the NDA's broad definition of confidential information.  And Le Tote does not claim that Urban acquired any trade secrets other than pursuant to the NDA.  Le Tote's claims plainly sound in breach of contract—not trade secret misappropriation—and are foreclosed by the terms of the agreement.  *See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 107 (3d Cir. 2001) (setting aside jury verdict on misappropriation of trade secrets claim because the alleged trade secrets involved information governed by contract).

The NDA also provides that, "[e]xcept for the obligations of use and confidentiality imposed in this Agreement, no obligation of any kind is assumed or implied against either party by virtue of the parties' meetings or conversations with respect to the Confidential Information." ECF No. 1-1 § 3.  If there was any doubt that Le Tote's misappropriation claims are barred by the

19

gist of the action doctrine, such language unambiguously forecloses either party's right to assert a statutory trade secret claim or any claim with respect to the "Confidential Information," as defined by the NDA, except a claim for breach of contract.

**B.** **Le Tote Does Not "Own" or "Possess" Any Trade Secret and Thus Cannot Satisfy an Essential Element of Its Statutory Claims.**

Even if the Court determines that Le Tote's misappropriation claims are not foreclosed by the terms of the parties' NDA, Le Tote cannot prove ownership and/or lawful possession of any alleged trade secret—an essential element of its statutory claims. A DTSA claim is available only to the "owners" of a protectible trade secret, 18 U.S.C. § 1836(b)(1); *see also Houser v. Feldman*, 569 F. Supp. 3d 216, 229 (E.D. Pa. 2021), whereas a claim under the PUTSA requires proof of "lawful possession"—i.e., the "*continued* use, possession, and protection" of the alleged trade secret. *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 323 (M.D. Pa. 2014), *aff'd*, 958 F.3d 168 (3d Cir. 2020) (emphasis added). Le Tote can prove neither.

In November 2020, Le Tote sold and transferred all its intellectual property, including any Le Tote trade secrets, to Saadia, a non-party to this litigation. The bankruptcy court presiding over Le Tote's Chapter 11 bankruptcy petition confirmed that Le Tote's transfer of assets to Saadia vested Saadia with all right, title, and interest of Le Tote to the acquired assets free and clear of all liens, claims, and encumbrances, such that Le Tote no longer owns or possesses any alleged trade secret. Because Le Tote cannot satisfy the element of "ownership"/"lawful possession" required under the DTSA and PUTSA, its misappropriation claims fail.

Urban recognizes this Court's prior ruling that Le Tote had standing to assert trade secret claims because the company owned the trade secrets at the time the litigation was commenced. Even if Le Tote has constitutional standing to bring a claim, that does not relieve Le Tote of its obligation to satisfy the elements of a trade secret misappropriation claim at trial. Once Le Tote

surrendered ownership of its intellectual property and business model, including any ostensible trade secrets at issue here, it lost whatever ability it had previously to seek relief for what it alleges to be a misappropriation.

### C.   Le Tote Cannot Recover Unjust Enrichment Damages for Breach of Contract.

Le Tote has not argued and has presented no evidence or expert opinions quantifying any actual losses attributable to the alleged misappropriation of its trade secrets or breach of the NDA. Rather, Le Tote's sole damages theory is for unjust enrichment.  But unjust enrichment damages are not recoverable on a breach-of-contract claim.  *See Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987).  Since Le Tote cannot prove actual damages, even if Le Tote prevails on its breach-of-contract claim, its sole remedy would be capped at nominal damages of one dollar.

### D.   The Court Must Determine Le Tote's Unjust Enrichment Damages, If Any.

Le Tote seeks to recover monetary damages based solely on a head start unjust enrichment damages theory—not lost profits or any other measure of damages tied to any Le Tote losses.  Le Tote's proffered damages expert purports to calculate the unjust enrichment allegedly gained by Urban as a consequence of the avoided time it would have taken Urban to discover or develop Le Tote's alleged trade secret information independently and by proper means.  As courts repeatedly have recognized, unjust enrichment is an equitable remedy rooted in law.  *See, e.g.*, *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 644 (2018) ("Unjust enrichment is an equitable remedy[.]").  Given claims in equity are questions of law, any unjust enrichment damages that Le Tote seeks to recover must be determined by the Court—not the jury.

## V.    <u>WITNESSES</u>

Urban's Witness List for trial was previously submitted to the Court as ECF No. 99-1.  The list does not include witnesses that Urban may call by deposition designation or for impeachment. Urban reserves the right to call as witnesses in its case-in-chief any individuals identified by Le Tote in its Witness List.

## VI.    <u>EXHIBITS</u>

The parties' combined exhibit list, which includes Joint Exhibits, Le Tote's Exhibits, and Urban's Exhibits, was previously submitted to the Court as ECF No. 99-2.[7]  Pursuant to this Court's Final Pretrial Order, Urban is submitting one complete set of its pre-marked, tabbed trial exhibits in a binder to chambers.

---

[7] Urban does not concede the admissibility of documents or testimony on the Exhibit List that Le Tote may seek to admit into evidence, including exhibits cited in the expert reports proffered by Le Tote, and reserves the right to object to Le Tote's proposed use of any exhibits at trial.  Urban reserves the right to offer demonstrative exhibits and to introduce into evidence any document to the extent necessary for rebuttal, impeachment, optional completeness, or to refresh a witness's recollection during trial.

MORGAN, LEWIS & BOCKIUS LLP

Dated: February 2, 2024

/s/ Douglas W. Baruch

Douglas W. Baruch (*pro hac vice*)
Lindsey T. Levy (*pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington, DC  20004
Phone: (202) 739-3000
douglas.baruch@morganlewis.com
lindsey.levy@morganlewis.com

Michael L. Banks (Pa. ID No. 35052)
Dana E. Becker (PA. ID NO. 209513)
2222 Market Street
Philadelphia, PA  19104
Phone: (215) 963-4628
Facsimile: (215) 963-5001
michael.banks@morganlewis.com
dana.becker@morganlewis.com

*Counsel for Defendant Urban Outfitters, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2024, I caused the foregoing to be filed with the Clerk of Court of the United States District Court for the Eastern District of Pennsylvania using the Court's CM/ECF system.  The foregoing is available for viewing and download from the Court's CM/ECF system, and a true and correct copy was served via CM/ECF to all counsel of record registered with the Court's CM/ECF system.

*/s/ Douglas W. Baruch*